UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Cr. No. 18-CR-127-1-LM |
| v. ) | |
| ) | |
| AHMAD KHAWAJA ) | |

## DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

NOW COMES the Defendant, Ahmad Khawaja, by and through his counsel, Wilson, Bush & Keefe, P.C. ("the Defendant"), and hereby respectfully requests that this Honorable Court to amend the remainder of his sentence to home confinement due to the current COVID-19 crisis and the Defendant's own personal circumstances. In support thereof, the Defendant submits the following:

### Factual Background

1. On July 11, 2018, the United States Attorney's Office for the District of New Hampshire filed a criminal complaint in this Court charging the Defendant with Knowing Importation of MDMA in violation of 21 U.S.C. 952, 960(a)(1), and (b)(3). Pursuant to that complaint and following an arrest warrant issued by this Court, law enforcement officials arrested the Defendant on July 12, 2018.

2. He appeared before U.S. Magistrate Judge Johnstone on that day for an initial appearance and arraignment where he pled not guilty. The Court ordered the Defendant detained pending placement in a residential drug treatment program. On July 25, 2018, the Court ordered the Defendant released on conditions to include pretrial supervision and

participation in an intensive outpatient substance abuse program. *Presentence Investigation Report (PSR)* ¶1-2.

3.      On August 8, 2018, the grand jury for this Court returned a two-count indictment charging the Defendant with Importation of MDMA in violation of 21 U.S.C. 952(a), 960(a)(1), and 960(b)(3), as well as Possession with the Intent to Distribute MDMA in violation of 21 U.S.C. 841(a)(1) and (b)(1)(C).

4.      On May 2, 2019, the Defendant appeared before this Honorable Court and pled guilty to Counts One of the indictment. *PSR* ¶5. The Court accepted the Defendant's plea and ordered that a sentencing hearing, along with a presentence investigation. *PSR* ¶5.

5.      When the Defendant first appeared before this Court, he was an active drug addict. The Defendant entered and successfully completed the inpatient substance abuse treatment program at Concord Hospital, and then he successfully completed all phases of the Intensive Outpatient Program (IOP) through Concord Hospital. As well, Ahmad became a patient at Seacoast Mental Health Center beginning on 1/31/19. He has attended regular therapy since that date. Further, Ahmad had been regularly employed and successfully passed every drug screen.

6.      The Defendant and counsel appeared for sentencing before this Court on October 31, 2019, for sentencing. During that sentencing hearing, the Court suggested the parties inquire into whether the Defendant would be eligible to participate in the LASER docket. As the Court likely recalls, the Defendant came before this Court as a drug addict, became sober while on pretrial release after participating in substance abuse counseling, remained employed, participated in necessary mental health counseling, and had support from many friends and family.

7.     The government subsequently determined that the Defendant was not eligible for the LASER docket.  After a contested sentencing hearing, the Court sentenced the Defendant to 30 months with a recommendation for the RDAP program and placement at FCI Danbury.

8.     The Defendant self-surrendered to FCI Danbury on February 20, 2020.

9.     Since his arrival at FCI Danbury, counsel for the Defendant has had difficulty contacting the Defendant as oftentimes nobody answers the phone at the facility.  Further, counsel for the Defendant had to contact the Court and United States Probation as the Defendant's counselor informed him that the counselor had not yet received the Defendant's sentencing paperwork weeks after the Defendant self-surrendered.  The Court and Probation confirmed that the paperwork had been provided to the Bureau of Prisons in the normal course.

10.    As the Court is likely aware, the Defendant anticipated that he would receive an earned reduction in his incarcerated sentence for successful completion of the RDAP program.  He as well would likely have earned general good-time credit along with a stay at a halfway house at the end of his incarcerated sentence.  A combination of all of these factors should have resulted in the Defendant spending significantly less than 30 months inside of a federal correctional institute.

11.    As the Court is most surely aware, the country and especially our jails and prisons are suffering the pandemic spread of COVID-19.  This virus is especially deadly for those over 65 years of age and those with other health conditions.  **[FILL IN WITH INFO]**

12.    Although the PSR indicates that the Defendant reported that he did not have any significant health conditions, nobody was aware of COVID-19 at the time the Defendant

submitted to the PSR interview.  The Defendant uses an inhaler for breathing difficulties.  Two years ago, his primary car physician prescribed him an inhaler due to his breathing difficulties.  The source of these breathing difficulties has yet to be specifically diagnosed, but the Defendant submits that the difficulties increase when he experiences more-than-average anxiety.  Once he arrived at FCI Danbury, he requested a medical appointment and an inhaler.  That was before COVID-19 was spreading at an exponential rate inside BOP facilities.  The Defendant has not yet seen a doctor or been prescribed an inhaler.  By way of an offer of proof, the Defendant informs this Court that his anxiety due to incarceration, but especially fear of contracting COVID-19, has greatly increased in recent weeks.  Further, his breathing difficulties have substantially increased, as well.

13.     As of yesterday, the BOP had placed 456 people into insolation as those prisoners were symptomatic, 3,850 inmates were in quarantine.  As of this morning, counsel understands from the Defendant that 34 inmates and 12 staff have tested positive for COVID-19 at FCI Danbury.  As well, it has been widely reported in the press that the BOP is going to use hydroxychloroquine to treat inmates with COVID-19.  The CDC has not endorsed this treatment, nor has it ruled out ill consequences from using this drug to treat COVID-19.

14.     The Defendant's parents report that the Defendant's anxiety, and as such his breathing difficulties, increase every day.  Further, counsel understands that inmates who are symptomatic do not report this to BOP officials for fear that they will be put into quarantine or isolation, and thus have no contact with families and otherwise be greatly restricted inside the subject BOP facility.

**Legal Argument**

I.    <u>Exhaustion Requirement in General</u>

15.    The First Step Act (FSA) authorizes courts to act independently of the Bureau of Prison's when a prisoner seeks to have his sentence reduced. 18 U.S.C.§ 3582(c)(1)(A) (detailing facts for court's consideration, none of which are generally part of the BOP Director's reasoning for denying such a request). See <u>United States v. Redd</u>, No.1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("the First Step Act authorized courts to act independently of the BOP Director").

16.    The principle of 'exhaustion' in this regard was originally a judicially-created requirement to satisfy comity interests. As a judicial creation, the exhaustion step was not a jurisdictional requirement. <u>McCarthy v. Madigan</u>, 503 U.S. 140, 144 (1992) (§ 2241 context). Instead, it was created to give the state courts an opportunity to remedy the constitutional violation without requiring the federal courts to get involved. <u>Ex parte Royall</u>, 117 U.S. 241 (1886); <u>Granberry v. Greer</u>, 481 U.S. 129, 1313 (1987).

17.    The exhaustion requirement simply requires the prisoner to fairly present the federal claim to the highest state court or administrative authority. <u>O'Sullivan v.Boerckel</u>, 526 U.S. 838, 845 (1999); <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S.Ct.887, 888, 130 L.Ed.2d 865 (1995). To "fairly present" a claim, the movant must describe not only the operative facts but also the federal legal theory on which the claim is based. <u>Duncan</u>, 513 U.S. at 365–66, 115 S.Ct. at 888. This requires specificity as to the federal constitutional legal standards at issue and the facts. See <u>Gray v. Netherland</u>, 518 U.S. 152, 162–63 (1996) ("a claim for relief . . . must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief").

II.     <u>The First Step Act Does Not Create a Mandatory Full Administrative Exhaustion Requirement for Motions for Reduction in Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).</u>

    A.     The Plain Text Gives Courts Power to Consider a Motion for Reduction in Sentencing Without Requiring Full Administrative Remedies.

18.     The First Step Act's (FSA's) compassionate release provision grants the sentencing court the power to reduce a prisoner's sentence in two circumstances: when "(i) extraordinary and compelling reasons warrant such a reduction" or "(ii) the defendant is at least 70 years of age" and meets other criteria. The statutory text does not require exhaustion of administrative remedies in all contexts. Instead, it permits courts to modify a term of imprisonment once it has been imposed:

> (1) in any case—
> (A) . . . the court, upon motion of the Director of the Bureau of Prisons *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier….

18 U.S.C. § 3582(c)(1)(A). This language does *not* make exhaustion of administrative remedies mandatory. The plain text gives the Court power and authority to reduce a sentence even without exhaustion of remedies in two contexts. The Court has such power whenever the Director of the Bureau of Prisons makes the motion or "the lapse of 30 days from the receipt of [a] request by the warden of the defendant's facility…." <u>Id</u>.

19.     The question then becomes whether the courts have the power, in light of the COVID-19 pandemic, to create an exception to the 30-day period set by Congress. The Supreme Court has clearly held that the courts' power to create exceptions to a statutory exhaustion requirement depends on the language of the statute. "[A]statutory exhaustion

provision stands on a different footing [from a judicially created one]. There, Congress sets the rules — and courts have a role in creating exceptions only if Congress wants them to." Ross v. Blake, 136 S.Ct. 1850, 1857 (2016).

20. In the Prison Litigation Reform Act of 1995 (PLRA) cases, such as *Ross*, the Supreme Court ruled that courts do not have the power to create emergency exceptions to the exhaustion requirement because Congress created a mandatory requirement. It reached this conclusion because the PLRA used mandatory language in setting out the administrative remedies' exhaustion standard.

21. The PLRA's exhaustion language is markedly different from the FSA's language. The PLRA language reads:

> *No action shall be brought* with respect to prison conditions undersection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted*.

Ross, 136 S. Ct. at 1856, 42 U.S.C. §1997e(a) (emphasis added). The Supreme Court focused on the "*no action shall be brought . . . until*" language in the PLRA. "[T]he PLRA's text suggests no limits on an inmate's obligation to exhaust — irrespective of any 'special circumstances.'" Id.; see also Woodford v. Ngo, 548 U.S. 81, *84(2006) (proper exhaustion of administrative remedies is necessary). Given this mandatory language, the Court concluded "mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account." Id.

22. As quoted earlier, the FSA's language has nothing akin to the mandatory language found by the *Ross* court to be controlling for the PLRA exhaustion requirement. This view of § 3582(c)(1)(A) finds support in the fact that district courts must take into

7

account factual developments that *post*-date exhaustion in deciding the motion for a reduction in sentence. Section 3582(c)(1)(A) requires consideration of the Section 3553(a) factors. The Supreme Court has said that, when conducting the analysis under Section 3553(a), a district court must consider the individual and his circumstances as they exist *at that moment*. See Pepper v. United States, 562 U.S.476, 492 (2011) (holding that a sentencing court must base Section 3553(a) analysis on "the most up-to-date picture" of a defendant's history and characteristics).

23. When the focus of the court's decision is on whether extraordinary and exceptional circumstances exist, the constantly changed facts about the COVID-19 pandemic need to be considered. To require re-exhaustion of these new facts would leave prisoners without the ability to seek relief from the court. That is plainly contrary to the FSA's language and the legislative intent to permit prisoners to file such motions on their own behalf.

24. The courts' power under § 3582(c)(2) also supports this view that administrative exhaustion is not jurisdictionally required. Subsection (c)(2) is another provision that grants courts the power to "reduce the term of imprisonment." In subsection (c)(2), the court may act "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C.994(o)" "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission…." 3482(c)(2).

25. The Circuits have found that the district courts have jurisdiction to consider the motion to reduce a sentence because the courts are empowered generally to have

jurisdiction over federal criminal cases. Section 3582(c) is not the source of the court's jurisdiction. See United States v. Taylor, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment. . . [n]or is subsection (c) phrased in jurisdictional terms."); see also United States v. Calton, 900 F.3d 706, 710-11 (5th Cir. 2018)(citing United States v. Caraballo-Martinez, 866 F.3d 1233, 1243 (11th Cir. 2017); United States v. May, 855 F.3d 271, 274-75 (4th Cir. 2017); United States v. Trujillo, 713 F.3d 1003, 1005 (9th Cir. 2013); see also United States v. Green, 886 F.3d 1300,1306 (10th Cir. 2018) (rejecting claim of jurisdictional bar). Accordingly, § 3582(c)generally should not be understood to impose jurisdictional prerequisites.

   B. A Court Having Power to Grant Compassionate Release without Requiring Full Administrative Exhaustion is Supported by the Legislative History of the FSA.

  26. The *Ross* Court also looked at the history of the PLRA to assess whether Congress intended the statutory language to be mandatory. The Court found the PLRA's history "underscores the mandatory nature of its exhaustion regime" because the PLRA replaced a predecessor "statutory scheme [that] made exhaustion 'in large part discretionary'" and "substituted an 'invigorated' exhaustion provision." Id. at1857-58. The PLRA statutory language includes a qualifier: "the remedies must indeed be 'available' to the prisoner." Id. Thus, the *Ross* Court remanded the case for further consideration of whether the prisoner had "available" remedies to exhaust. Id. at 1862. It did so because the statutory language stated that exhaustion was required "as [administrative remedies] are available…." Id. at 1856, 1862; 42U.S.C. §1997e(a).

9

27. In contrast, the FSA's amendments to the compassionate release law was Congress' response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." U.S. Dep't Justice, *The Federal Bureau of Prisons' Compassionate Release Program*, p. 11 (2013)[1]; see generally Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 Fed.Sent'g Rep. 167 (2009); Shon Hopwood, *Second Looks & Second Chances*, 41 Cardozo L. Rev. 83 (Oct. 2019). The changes made to section 3582(c)(1)(A) were intended to reform sentencing decision and increase the use of the "compassionate release" provisions that already existed.

28. The legislative history of the First Step Act supports the view that the exhaustion requirement is subject to exceptions. The purpose of the FSA's amendment to section 3582(c)(1)(A), permitting prisoners to file the motion for a reduction in sentence, was intended to increase the use of that mechanism. The FSA entitled this section "Increasing the Use and Transparency of Compassionate Release." 164 CONG. REC. H10358 (daily ed. Dec. 20, 2018). Senator Cardin noted the First Step Act made several reforms to the federal prison system, including "expedit[ing] compassionate release applications." 164 CONG.REC. S7774 (daily ed. Dec. 18, 2018). See United States v. Young, No.2:00-CR-

---

[1] More specifically, the Inspector General found the BOP: (1) failed to provide adequate guidance to staff regarding the medical and nonmedical criteria for compassionate release consideration; (2) had no timeliness standards for reviewing compassionate release requests, and timeliness standards for inmate appeals do not consider the special circumstances of medical compassionate release requests; (3) did not have formal procedures to inform inmates about the compassionate release program; and (4) failed to have a system to track compassionate release requests, the timeliness of the review process, or whether decisions made by institution and Regional Office staff are consistent with each other or with BOP policy. U.S. Dep't Justice, *The Federal Bureau of Prisons' Compassionate Release Program*, p. 11.

10

00002-1, 2020 WL 1047815, at *5, 2020 U.S. Dist. LEXIS 37395, *14 (M.D. Tenn. Mar. 4, 2020) (noting intent to expedite compassionate release applications). Congressman Nadler noted that the FSA included "a number of very positive changes, such as . . . improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 CONG.REC. H10361-H10362 (Dec. 20, 2018).

      C.      The Absence of Mandatory Language in the FSA's Provision Demonstrates that the Normal Administrative Law Exhaustion Exceptions Apply.

      29.      While Justice Breyer in *Ross* concurred with the majority's outcome, he wrote separately to remind us that the term "exhausted" in administrative law includes "well-established exceptions to exhaustion." 136 S. Ct. at 1863, citing Woodford v.Ngo, 548 U.S. 81, 103 (2006). See also Sims v. Apfel, 530 U.S. 103, 115 (2000) (Breyer, J., joined by Rehnquist, C. J., and Scalia and Kennedy, JJ., dissenting) (recognizing futility, constitutional claims as exceptions); Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 13 (2000) (futility); McKartv. United States, 395 U.S. 185, 197-201 (1969) (hardship); McCarthy v. Madigan, 503 U.S. 140, 147-148 (1992) (inadequate or unavailable administrative remedies); see generally II R. Pierce, Administrative Law Treatise § 15 (4th ed. 2002); Malouf v. SEC, 933F.3d 1248 (10th Cir. 2019) (security law includes exhaustion exception under "reasonable" circumstances); Singh v. Barr, 400 F. Supp. 3d 1005, 1013 (SD CA 2019) (waiving administrative exhaustion for redetermination of bond decision under 8 C.F.R. § 1003.19(e) because "no relevant circumstances have changed").

      1.      Futility and Irreparable Harm

      30.      When a prisoner is facing irreparable harm and futility, courts have waived exhaustion of administrative remedies. Garza v. Davis, 596 F.3d 1198, 1203-04 (10th Cir.

2010) (recognizing futility exception in context of § 2241 petition); Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 239 n.2 (3d Cir. 2005) ("[E]xhaustion would be futile, given that *Woodall* is not challenging the application of the BOP regulations, but their validity."); Elwood v. Jeter, 386 F.3d 842, 844, n.1 (8th Cir. 2004); Fournier v. Zickefoose, 620 F.Supp.2d 313, 317 (D. Conn. 2009); Boucher v. Lamanna, 90 F.Supp.2d 883, 887 (N.D. Ohio 2000) (concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing the prisoner's offense as a violent crime was mandatory, the issue was a legal one that the BOP had consistently defended, and the potential for immediate release counseled timely consideration of the petitioner's case); see also Chevrier v.Marberry, 2006 WL 3759909, *2-3 (E.D. Mich. Dec. 20, 2006); Cushenberry v. Federal Medical Center, 530 F.Supp.2d 908, 912 (E.D.Ky., 2008); Zucker v. Menifee, 2004 WL 102779, *4 (S.D.N.Y. Jan. 21, 2004); Snyder v. Angelini, 2008 WL4773142, *2 (E.D.N.Y. Oct. 27, 2008); Ross v. Fondren, No. 08- 325, 2008 WL4745671 (D. Minn. Oct. 29, 2008); Kelly v. Daniels, 469 F.Supp.2d 903, 904 (D. Or. 2007); Scott v. Lindsay, No. 07 CV 2622 (JG), 2007 WL 2585072, at *2 (E.D.N.Y. Sept. 10, 2007).

       2.     Futility May Excuse Asking BOP for Relief Based on COVID-19 Pandemic.

31.     In the compassionate release context, courts have recognized that under the right circumstances, seeking relief from BOP can be futile and so exhaustion of administrative remedies is waived.  Thody v. Swain, 2019 U.S. Dist. LEXIS 226582,* 5 (CD CA Nov. 26, 2019) (March 22, 2020 finding prisoner failed to demonstrate futility), citing Fraley v. United States Bureau of Prisons, 1 F.3d 924 (9th Cir. 1993) (where administrative appeal to Regional Director certainly denied request based on BOP policy, further

application for administrative remedies would be futile); Merth v. Puentes, 2019 U.S. Dist. LEXIS 114799, *8 (ED CA July 10, 2019) (holding administrative exhaustion of FSA's good time credits provision futile and so waived).  Cf. United States v. Mills, 2019 U.S. Dist. LEXIS 10954, *3 (MD FL January 23, 2019) (prisoner cannot invoke futility of administrative remedies when he requested compassionate release before the enactment of FSA.)

32. These conclusions are supported by other provisions in the FSA.  Specifically, the Act carves out notice and expedited administrative consideration for prisoners with terminal illnesses. 18 U.S.C. § 3582(d).  The Act broadly defines a "terminal illness" as "a disease or condition with an end-of-life trajectory." Id. § 3582(d)(1). It then imposes on BOP the obligation to give notice to the defendant and others "not later than 72 hours after the diagnosis" "with a terminal illness." 18 U.S.C. §3582(d)(2)(A)(I).  Upon request, the BOP is to "ensure that Bureau of Prisons employees assist the defendant in the preparation, drafting, and submission of a request for a sentence reduction pursuant to subsection (c)(1)(A); and . . . not later than 14 days of receipt of a request for a sentence reduction submitted on the defendant's behalf … process the request…." Id., § 3582(d)(2)(A)(iii), (iv).

33. Both the language of the FSA and the legislative history support the conclusion that full exhaustion of administrative remedies is subject to exceptions and it is not mandatory.

III. Changes in the Factual Basis for Relief Sought Does Not Automatically Require a New Round of Administrative Exhaustion.

34. Only if the factual record *significantly* changes between the time the issue was presented to the Warden and then to the federal court might a previously exhausted claim become unexhausted.  See Picard v. Connor, 404 U.S. 270, 275-278 (1971).

35. For those prisoners who have already exhausted administrative remedies and have a compassionate release motion pending in district court, the fact that there is a COVID-19 pandemic is a factual matter that the courts can take judicial notice.  See Thornton v. United States, 271 U.S. 414, 420 (1926) (court can take judicial notice of Secretary of Agriculture's quarantine of cattle regulations); Evid. Rule 201 ("court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction.").  That COVID-19 poses a great fatal risk to people 65 years of age and older, a fatal risk to those younger than 65, and those with preexisting conditions is also not subject to reasonable dispute and generally known throughout the United States.  See Centers of Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) Are You at High Risk for Severe Illness?* (March 12,2020), https://bit.ly/2vgUt1P; World Health Organization, *Q&A on corona viruses (COVID-19)*, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (those at greater risk from COVID-19 include "older persons and persons with pre-existing medical conditions (such as high blood pressure, heart disease, lung disease, cancer or diabetes)" (March 9, 2020)).

36. If one presented a request for compassionate release to BOP, without specific reliance on the COVID-19 pandemic, he should be able to add this new COVID-19 facts in a district court motion for a reduction in sentence.  The BOP's response to the COVID-19 pandemic has not included identifying or releasing those prisoners who are at a higher risk from this disease.  *See* Federal Bureau of Prisons COVID-19Action Plan,

14

https://www.bop.gov/resources/news/20200313_covid-19.jsp (March13, 2020).  Making such a new request that adds in the COVID-19 pandemic would be futile as BOP's policy response does not include consideration of early release or a recommendation for a reduction in sentence.  Nor has BOP created an emergency administrative remedy for prisoners at serious risk from COVID-19. Seeking such administrative relief is futile.  See Fletcher v. Menard Correctional Center, 623 F.3d1171, 1174 (7th Cir. 2010) ("If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust.").

IV.     The Court Should Order the Defendant Be Placed on Home Confinement.

37.     Here, the Court should order that the Defendant be released to home confinement and make any other changes to the Defendant's sentence it deems appropriate.  The Defendant is at substantial health risk, and possibly at a fatal risk, if he remains incarcerated.  Recognizing this, Attorney General Barr directed the BOP in a memorandum made public on April 3, 2020, as follows, "For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine."

38.     As well, a representative of the union representing federal correctional officers filed a complaint with U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA") on March 31, 2020.  Attached hereto as Exhibit A.  Therein, the union complains that the BOP's actions regarding COVID-19 are "proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities.  The [BOP]'s actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities."  The complaint further alleges

15

that the BOP has failed to introduce controls to mitigate or prevent exposure or further exposure to the virus. This complaint specifically cites FCI Danbury as a facility that is affected by the BOP's failures in this regard.

39. As well, Dr. Brie Williams, has prepared an affidavit regarding the dangerousness of COVID-19 to the inmate population. Attached as Exhibit B. Dr. Williams, recognizing the dangers, submits that any inmate who is not a danger to the community, should be released. She also recognizes that because inmates live in such close quarters (the Defendant currently resides in a dormitory-style building), there is an extremely high risk accelerated transmission of COVID-19. Dr. Williams further recognized that even young inmates who suffer from asthma are "very vulnerable" to COVID-19. Dr. Williams went on to describe how the inmate population is especially at risk due to inadequate medical treatment, and that the WHO stated prisons around the world would experience "high mortality rates" from COVID-19.

40. The Defendant is not a danger to the community. He was a very young man when he committed the subject crime in this case. He has been incarcerated for several months, and now his life is at risk. He has been ignored by the BOP in his efforts to address his medical concerns, and he is a massive risk to contract COVID-19. As well, the Defendant has been informed that the RDAP program has been suspended due to COVID-19. Thus, he will be delayed from entering it, if he ever is able to enter it, and this will delay his release from incarceration. The Defendant has a home to which he can accomplish a 14-day quarantine, and he will participate in any programs deemed appropriate by the Court or United States Probation. In light of the current public health crisis, and the special risk he

faces, this Court should order him to be placed on home confinement for the remainder of his incarcerated sentence.

41. Due to the nature of the relief requested here, the Defendant did not seek the position of the government as counsel believes the government objects to this relief.

V. Request for Relief

42. Wherefore, Ahmad Khawaja, through counsel, respectfully requests that the Court grant the relief requested, specifically that the Court amend his sentence to home confinement to a term determined appropriate by the Court, combined with any other conditions the Court or Probation deem appropriate or necessary.

Finally, the defense requests any such other relief as may be deemed just and equitable.

                                      Respectfully submitted,

                                      Ahmad Khawaja
                                      By and through his counsel,

DATED: April 9, 2020                   /s/Charles J. Keefe
                                      Charles J. Keefe (N.H. Bar No. 14209)
                                      Wilson, Bush & Keefe, P.C.
                                      378 Main Street
                                      Nashua, NH 03060
                                      (603) 595-0007
                                      keefe@wbdklaw.com

**Certificate of Service**

I, Charles J. Keefe, hereby certify that true copies of the above document were delivered to AUSA John Davis and the United States Probation Office.

                                      /s/Charles J. Keefe
                                      Charles J. Keefe