## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Case No. 18-CR-127-1-LM |
| AHMAD KHAWAJA, | ) |
| | ) |
| Defendant. | ) |

### GOVERNMENT'S OBJECTION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America, by Scott W. Murray, United States Attorney, and Assistant U.S. Attorney John S. Davis, objects to Defendant Ahmad Khawaja's Motion for Compassionate Release. ECF No. 43. Because the defendant offers no evidence that he has sought to exercise, much less exhausted, his administrative remedies with the Bureau of Prisons, he is ineligible for release, and his motion must be denied.

### BACKGROUND

On May 2, 2019, Khawaja pleaded guilty to importation of approximately two pounds of 3, 4-Methylenedioxymethamphetamine (a.k.a. MDMA, ecstasy, molly), a Schedule I controlled substance. ECF No. 28. On January 2, 2020, this Court sentenced Khawaja to 30 months in prison. ECF No. 42. Defendant self-surrendered at FCI Danbury on February 20, 2020. Thus far he has served less than 2 months of his 30-month sentence.

On April 9, 2020, Khawaja moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). In his motion he contends that the statute's exhaustion requirement is not

1

mandatory and that he should be released to home confinement because of the dangers posed by the Covid-19 pandemic. The government hereby objects.

## ARGUMENT

**I.    Defendant's Demand for Compassionate Release Should be Evaluated Against a Practical and Legal Backdrop.**

The Bureau of Prisons ("BOP") has implemented a COVID-19 action plan to minimize the risk of transmission into and throughout its facilities. The BOP is actively working on the critical problem of containing the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, begun providing masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for the defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided the BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." Congress has now, temporarily, expanded this provision, while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes

2

requisite finding that emergency conditions will materially affect the function of BOP.[1] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, BOP has placed at least an additional 615 inmates on home confinement (see https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released.[2]

---

[1] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

[2] BOP has described its increased use of home confinement on its website: https://www.bop.gov/resources/news/20200405_COVID19_home_confinement.jsp

"In response to COVID-19, the Bureau of Prisons (BOP) has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures.

The BOP has increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement. On April 3, the Attorney General exercised emergency authority under the CARES Act, to further increase Home Confinement.

Given the surge in positive cases at select sites and in response to the Attorney General's directives, the BOP has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities to determine which inmates are suitable for home confinement.

Inmates do not need to apply to be considered for home confinement. Case management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the

BOP's releases of inmates to home confinement must take into account, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement

---

Attorney General. The Department has also increased resources to review and make appropriate determinations as soon as possible.

While all inmates are being reviewed for suitability, any inmate who believes they are eligible may request to be referred to Home Confinement and provide a release plan to their Case Manager. The BOP may contact family members to gather needed information when making decisions concerning Home Confinement placement.

Since the release of Attorney General Barr's original memo to the Bureau of Prisons on March 26, 2020 instructing us to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 566 inmates on home confinement. There are currently 3,419 inmate on home confinement and 7,199 inmates in Residential Reentry Centers (RRCs). To further assist inmates in pre-release custody, the BOP has waived financial requirement to pay subsistence fees.

We are deeply concerned for the health and welfare of those inmates who are entrusted to our care, and for our staff, their families, and the communities we live and work in. It is our highest priority to continue to do everything we can to mitigate the spread of COVID-19 in our facilities.

The BOP appreciates the dedication and significant work of BOP staff in carrying out their difficult mission in the face of the public emergency. The BOP would also like to thank the Attorney General, the CDC, the Public Health Service, and our state and local community partners for their support and assistance in the BOP's COVID-19 response."

successful. To help accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement. By having BOP control the 14-day period of quarantine—rather than leaving inmates to conduct their own quarantines after release—BOP can ensure the effectiveness of the quarantine and evaluate the appropriateness of any determination that the inmate is not a carrier of the coronavirus.

In addition to these efforts to increase the use of home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—the defendant implicitly envisions a system in which hundreds of federal district judges around the country attempt to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

Under the present circumstances, courts are not well positioned to:

- determine whether an inmate's proposed place to go after release from prison is a place where no person is infected or soon to be infected;

- evaluate with the stretched resources of BOP and the Probation Office whether the place where a defendant would go after release from prison is suitable in enabling a defendant to avoid reoffending and returning to prison—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12;

- assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- appropriately triage the use of available testing by medical need, not by an unsystematic series of court orders;

- evaluate whether a released inmate could find—during a pandemic—food, medical care, and safe (often interstate) transportation needed to relocate from prison to the inmate's home;

- determine the extent to which an inmate's relief makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, See https://www.bop.gov/coronavirus/;

- balance how likely an inmate's release will improve his health prospects against the likelihood that continued incarceration would affect the same inmate's health;

- determine accurately, with appropriate records, how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison; and

- compare the improvement in prison conditions and risk to the public of this inmate's release versus releasing another inmate who could use the resources available for post-imprisonment supervision.

To avoid a mass release of inmates that has a serious, negative effect on public welfare, the Court would also have to take into account the risk to probation officers, police officers, and others who must immediately cope with and supervise released inmates. This list is not exhaustive and, indeed, could include many additional considerations. The point is that the factors cited above illustrate a general truth: there are no known examples of effectively litigating our way out of a crisis by taking up thousands of cases simultaneously in hundreds of courtrooms across the Nation and attempting to have the judicial process evaluate prisoner releases in a pandemic that changes daily and even hourly.

BOP has a massively important task before it. Layering the burdens of a huge volume of emergency litigation on top of the difficult challenges that the pandemic has handed BOP is unhelpful. And it is likely to incentivize a counterproductive race to the courthouse in countless cases—a race that will necessarily require this Court to mete out limited re-entry and supervision resources on a first-come-first-serve basis that favors defendants who flout the administrative processes in place to prioritize release for the most vulnerable and least dangerous.

**II.     Defendant Has Failed to Exhaust Administrative Remedies by Failing to Provide BOP With the Required 30-Day Period to Evaluate His Request for Compassionate Release Based on COVID-19.**

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)    extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

In his motion, the defendant does not assert that he has met either of these prerequisites to filing this motion. He states that his counsel has had a difficult time reaching him by telephone and that there was a delay in his counselor's receiving sentencing paperwork in a timely manner. The defendant further states that he anticipated a reduction in sentence for the successful completion of the RDAP program and good-time credit, but has not yet been able to enter that program. Defendant further states that two years ago his primary care physician prescribed an inhaler due to breathing difficulties (although he has not had an inhaler since he was confined to FCI Danbury).

Notably, however, the defendant does not allege that he has petitioned BOP to bring a motion on his behalf to reduce his term of imprisonment. Neither has he exhausted the BOP's administrative appeals process. Nor have 30 days passed from a request to the warden for relief.

His motion is therefore facially insufficient. 18 U.S.C. § 3582(c)(1)(A). *See also United States v. Eisenberg*, 2020 WL 1808844 (D.N.H. Apr. 9, 2020 (denying § 3582(c)(1)(A) motion without prejudice for failure to exhaust administrative remedies); *United States v. Nance*, 2020 WL 114195, at 2 (W.D. Va. Jan. 10, 2020); *United States v. Bolino*, 2020 WL 32461, at 1 (E.D.N.Y. Jan. 2, 2020) (collecting cases).)

Section 3582(c)'s exhaustion requirement is statutory, and thus is not the sort of judicially crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). By significant contrast, *statutory* exhaustion requirements "stand[] on a different footing." *Id.* There, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Id.* Thus, where a statute contains mandatory exhaustion language, the only permissible exceptions are those contained in the statute. *Id.*; *see also United States v. Lugo*, 2020 WL 1821010 (D. Me. Apr. 10, 2020) (holding that section 3582(c)'s exhaustion provision is mandatory); *Sayyah v. Farquharson*, 382 F.3d 20, 24 (1st Cir. 2004) (holding that statutory exhaustion bar in removal context was jurisdictional).

In recent weeks, numerous defendants around the country have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be excused.   Multiple courts have concluded that a district court cannot entertain a First Step Act motion unless a defendant has exhausted administrative remedies—even in the face of the COVID-19 pandemic.[3] *See also United States*

---

[3] *See United States v. Roberts*, No. 18 Cr. 528 (JMF) (S.D.N.Y. Apr. 8, 2020) (Dkt. 296); *United States v. Ramos*, No. 14 Cr. 484 (LGS), 2020 WL 1685812, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *3 (S.D.N.Y. Apr. 6, 2020); *United*

*v. Raia*, 2020 WL 1647922 (3d Cir. April 2, 2020) (concluding that failure to exhaust administrative remedies for request for compassionate release based on COVID-19 pandemic presented "a glaring roadblock foreclosing compassionate release at this point" and that "strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical— importance"); *United States v. Johnson*, 2020 WL 1663360, at 3–6 (D. Md. Apr. 3, 2020) (denying request for compassionate release based on COVID-19 pandemic; concluding that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no exceptions to the exhaustion requirement); *United States v. Zywotko*, 2020 WL 1492900, at 1–2 (M.D. Fla. Mar. 27, 2020) (denying request for compassionate release based on COVID-19 pandemic because defendant failed to exhaust administrative remedies). Here, the defendant cannot establish that the Court has the power to waive the administrative exhaustion requirement.

COVID-19 presents unusual circumstances, in which compassionate release decisions should be made expeditiously. But the text of Section 3582 contains no exigency exception for

---

*States v. Arena*, No. 18 Cr. 14 (VM) (S.D.N.Y. Apr. 6, 2020) (Dkt. 354); *United States v. Hernandez*, No. 18 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020); *United States v. Carver*, No. 19 Cr. 6044, 2020 WL 1604968, at *1 (E.D. Wa. Apr. 1, 2020); *United States v. Clark*, No. 17 Cr. 85 (SDD), 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020); *United States v. Williams*, No. 15 Cr. 646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020); *United States v. Garza*, No. 18 Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Zywotko*, No. 19 Cr. 113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Eberhart,* No. 13 Cr. 313 (PJH), 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Gileno*, No. 19 Cr. 161, 2020 WL 1307108, *3 (D. Conn. Mar. 19, 2020). *But see United States v. Perez*, No. 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); *United States v. Eisenberg,* No. 16 Cr. 157, 2020 WL 1808844 (D. N.H. April 9, 2020); *United States v. Colvin*, No. 19 Cr. 179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020). Both *Perez* and *Colvin* relied on *Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019), which as discussed further below, is inapposite because it involves judge-made exhaustion doctrine.

such circumstances, and indeed the text affirmatively refutes the availability of such an exception in two respects. While many statutory exhaustion provisions require exhaustion of all administrative remedies before a claim is brought in court, Section 3582 provides an alternative: exhaustion of all administrative rights *or* the lapse of 30 days from the warden's receipt of the inmate's request for compassionate release, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). This 30-day alternative rule is a limited futility-like exception, and, therefore, "[g]iven Congress's decision to mandate exhaustion and specify a single alternative, the Court is not free to infer a 'general unwritten special circumstances exception.'" *Ross*, 136 S. Ct. at 1857.

The mandatory exhaustion requirement accommodates the essential role that the BOP plays in the compassionate release process. Informed decisions about compassionate release require the collection of information, like disciplinary records and medical history, that the BOP is uniquely suited to obtain and which will benefit both the BOP and later the court in evaluating such claims. The BOP is also well situated to make relative judgments about the merits of compassionate release petitions – particularly at a time like this when many inmates are making petitions advancing similar claims – and adjudicate those positions in a consistent manner. The Court may of course review those judgments, but the Congress expressed its clear intent that such review would come second, with the benefit of the BOP's initial assessment. *See United States v. Woodson*, 2020 WL 1673253 (S.D.N.Y. April 6, 2020).

The defendant suggests that the exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic. However, there is no "futility" exception, as the Supreme Court has made clear that courts have no authority to invent an exception to a statutory exhaustion requirement. Thus, in *United States v. Perez*, 2020 WL

11

1546422 (S.D.N.Y. April 1, 2020), the court incorrectly excused exhaustion of a claim based on COVID-19 as "futile," relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), which addressed only a judicially created exhaustion requirement. And, in any event, a request in this context is not futile, because, as explained further below, BOP fully considers requests for compassionate release.

To be sure, *Washington* states that: "Even where exhaustion is seemingly mandated *by statute or decisional law*, the requirement is not absolute. The Supreme Court itself has recognized exceptions to the exhaustion requirement under 'three broad sets of categories.'" *Washington*, 925 F.3d at 118 (emphasis added) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)). But the inclusion of the phrase "by statute" is not supported by the citation that follows. *McCarthy* is another case involving a judge-made exhaustion requirement. *See McCarthy*, 503 U.S. at 152 ("Congress has not *required* exhaustion of a federal prisoner's *Bivens* claim."). It thus provides no support for the notion that exhaustion mandated "by statute" is not absolute. *See Bastek*, 145 F.3d at 95 (rejecting application of *McCarthy* exceptions in a statutory case). Further, when *Washington* goes on to discuss three recognized exceptions to exhaustion, it is describing three exceptions recognized in *McCarthy* in the judge-made context. But as the Supreme Court made clear in *Ross*, this analysis ignores the critical distinction between statutory and judge-made exhaustion requirements. Given that *Washington* was a judge-made exhaustion case, its statement that exhaustion mandated "by statute" is "not absolute" is dicta, and cannot supplant the clear statements to the contrary in cases like *Ross* and *Bastek*. Thus, in *Perez*, the district court erred by citing *Washington*'s discussion of judge-made exceptions to a judge-made exhaustion rule to justify excusing exhaustion under Section 3582(c). *See United States v. Perez*, 2020 WL 1546422, at 2 (S.D.N.Y. April 1, 2020) (relying on *Washington*).

12

Accordingly, the requirement of a 30-day period to afford BOP the initial review of the defendant's request cannot be excused.  While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies.  And this is for good reason:  The BOP conducts an extensive assessment for such requests.  See 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.   As the Procedures reflect, the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement.  Its assessment will always be of value to the parties and the Court.

This remains true in the present crisis. The government does not underplay the defendant's concerns in any way.  This Court, like all citizens, is vividly aware of the dangers that COVID-19 poses.  The virus has infected large numbers of people and caused many deaths in a short time. BOP has accordingly taken significant measures in an effort to protect the health of the inmates in its charge.  BOP began planning for potential coronavirus transmissions in January 2020.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO).  On March 13, 2010, BOP announced that it was implementing the Coronavirus (COVID 19) Phase Two Action Plan ("Action Plan") to minimize the risk of coronavirus transmission into and inside its facilities.  The Action Plan comprises many preventive and mitigation measures, including the

following: all incoming inmates are screened, and staff are regularly screened; contractor visits are limited to essential services, while nearly all attorney, social, and volunteer visits have been suspended; inmate movements between facilities have been extremely limited; and institutions are taking additional steps to modify operations to maximize social distancing.  BOP has taken further steps as events require, including confining all inmates to their living quarters for a 14-day period beginning on April 1, 2020, in order to mitigate any spread of the disease.  Many additional details are available at the BOP website, www.bop.gov.

BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities.  The provision of Section 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time.  As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."  *Raia*, 2020 WL 1647922, at 2.  Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.  *Lugo*, 2020 WL 1821010, at *5 ("the BOP, which possesses greater knowledge of the COVID-19 conditions within its prisons and of [defendant's] specific situation, must be given the first opportunity to respond to [defendant's] request for release before it comes to this Court").

In sum, the analysis of a statutory exhaustion requirement must "begin[] with the text" and utilize "ordinary interpretive techniques." *Ross*, 136 S. Ct. at 1856 and 1858 n.2. As set forth above, the text of Section 3582(c) provides for no exceptions. Accordingly, because the defendant has not exhausted his administrative remedies as set forth in 18 U.S.C. § 3582(c)(1)(A), his motion must be denied.

## CONCLUSION

WHEREFORE, for the reasons stated, this Court should deny defendant's motion for compassionate release.

Dated:   April 14, 2020                                Respectfully submitted,

                                                       SCOTT W. MURRAY
                                                       United States Attorney

                                                       /s/John S. Davis
                                         By:           John S. Davis
                                                       Bar No. 592
                                                       Assistant U.S. Attorney
                                                       53 Pleasant Street, 4th Floor
                                                       Concord, New Hampshire 03301
                                                       (603) 225-1552