UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>AHMAD KHAWAJA )<br>) | Cr. No. 18-CR-00127-1-LM |

### DEFENDANT'S MOTION TO REDUCE TERM OF IMPRISONMENT PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

NOW COMES the Defendant, Ahmad Khawaja, by and through his counsel, Wilson, Bush & Keefe, P.C. ("the Defendant"), and hereby respectfully requests that this Honorable Court reduce his term of imprisonment and order him to be placed on probation or supervised release accompanied with home confinement due to the current COVID-19 crisis at FCI Danbury and the Defendant's own personal circumstances.  In support thereof, the Defendant submits the following:

**Factual Background**

1.     On July 11, 2018, the United States Attorney's Office for the District of New Hampshire filed a criminal complaint in this Court charging the Defendant with Knowing Importation of MDMA in violation of 21 U.S.C. 952, 960(a)(1), and (b)(3).  Pursuant to that complaint and following an arrest warrant issued by this Court, law enforcement officials arrested the Defendant on July 12, 2018.

2.     The Defendant appeared before U.S. Magistrate Judge Johnstone on that day for an initial appearance and arraignment where he pled not guilty.  The Court ordered the Defendant detained pending placement in a residential drug treatment program.  On July 25, 2018, the Court ordered the Defendant released on conditions to include pretrial supervision

and participation in an intensive outpatient substance abuse program.  *Presentence Investigation Report (PSR)* ¶1-2.

3.     On August 8, 2018, the grand jury for this Court returned a two-count indictment charging the Defendant with Importation of MDMA in violation of 21 U.S.C. 952(a), 960(a)(1), and 960(b)(3), as well as Possession with the Intent to Distribute MDMA in violation of 21 U.S.C. 841(a)(1) and (b)(1)(C).

4.     On May 2, 2019, the Defendant appeared before this Honorable Court and pled guilty to Count One of the Indictment.  *PSR* ¶5.  The Court accepted the Defendant's plea and ordered that a sentencing hearing be scheduled along with a presentence investigation.  *PSR* ¶5.

5.     When the Defendant first appeared before this Court, he was an active drug addict.  He had spent several days in jail before his appearance, and quite simply – he was a mess when he first appeared before the Court.  After being released to pretrial supervision, the Defendant entered and successfully completed the inpatient substance abuse treatment program at Concord Hospital, and then he successfully completed all phases of the Intensive Outpatient Program (IOP) through Concord Hospital.  As well, Ahmad became a patient at Seacoast Mental Health Center beginning on 1/31/19.  He has attended regular therapy since that date.  Further, Ahmad had been regularly employed and successfully passed every drug screen.  The Defendant understands that he appeared before this Court for committing a crime, but his reaction to his arrest is what we hope for in all drug-related criminal defendants.

6.     The Defendant sought to take responsibility for his actions here, and he and counsel appeared for sentencing before this Court on October 31, 2019.  During that

2

sentencing hearing, the Court suggested the parties inquire into whether the Defendant would be eligible to participate in the LASER (Law Abiding Sober Employed Responsible) docket. As the Court likely recalls, the Defendant came before this Court as a drug addict, became sober while on pretrial release after participating in substantial substance abuse counseling, remained employed, participated in necessary mental health counseling, and had support from many friends and family.

7. The government subsequently determined that the Defendant was not eligible for the LASER docket. After a contested sentencing hearing, the Court sentenced the Defendant to 30 months with a recommendation for the RDAP and placement at FCI Danbury.

8. The Defendant self-surrendered to FCI Danbury on February 20, 2020.

9. Since his arrival at FCI Danbury, counsel for the Defendant has had difficulty contacting the Defendant as oftentimes nobody answers the phone at the facility. Further, counsel for the Defendant had to contact the Court and United States Probation as the Defendant's counselor informed him that the counselor had not yet received the Defendant's sentencing paperwork weeks after the Defendant self-surrendered. This sentencing paperwork was crucial as it contained a recommendation from the Court for the Defendant to participate in substance abuse treatment. The Court and Probation confirmed that the paperwork had been provided to the Bureau of Prisons in the normal course.

10. As the Court is likely aware, the Defendant anticipated that he would receive an earned-time reduction on his incarcerated sentence for successful completion of the RDAP. He as well would likely have earned general good-time credit along with a stay at a halfway house at the end of his incarcerated sentence. A combination of all of these factors

should have resulted in the Defendant spending significantly less than 30 months inside of a federal correctional institute.

11.     With the Defendant self-surrendering on February 20, 2020, and presuming good-time credit (which the BOP has already allocated to him), he is currently designated for release on March 25, 2022.  This includes time that he would spend at a half-way house as he transitions from 'behind the walls' incarceration to being home on supervised release.

12.     As the Court recommended substance abuse treatment and counseling, the Defendant is eligible to receive additional earned-time credit for participation in the Residential Drug Abuse Program (RDAP) offered by the BOP at FCI Danbury.  Ahmad sought to apply for admission to this program immediately upon his entry into FCI Danbury. He was told for several weeks that the facility had not received his sentencing paperwork, so he could not apply until that happened.  Counsel had to intervene in order to ensure that the sentencing material had been properly sent to FCI Danbury almost immediately after the Defendant's sentencing.

13.     The Defendant finally was eligible to apply for RDAP, and he did so. However, while his application was pending, COVID-19 caused BOP to shut down all such programs due to the health risks associated with them and protocols that were put in place for inmate interactions.  As of right now, there is no plan or timeframe for re-starting RDAP.

14.     Per the BOP, if the Defendant had been able to timely enter RDAP, and had COVID-19 not caused the shutdown of the program, the Defendant would have been eligible to receive an additional six months off of his sentence (excluding any time at a half-way house).  Ironically, if the Defendant had received a sentence of 31 months, he would have been able to receive nine months off of his sentence.

15.     The RDAP takes nine months to complete.  Thus, for the Defendant to receive the appropriate time-credit for participating in the program at this point, and assuming at least three months at a half-way house, the Defendant must begin the program in the very near future.  That is not going to happen.  Not only is the program indefinitely shut down, the Defendant's application to the program has not even yet been accepted due to the delay in BOP officials processing his sentencing paperwork.[1]

16.     By letter dated April 22, 2020, attached hereto as Exhibit A, the Defendant through counsel requested the Warden at FCI Danbury to release the Defendant to home confinement.  The Warden never responded to counsel or the Defendant.

17.     COVID-19 has especially decimated FCI Danbury.  As one justice of this Court has written, "It is undisputed that FCI Danbury has had and continues to have a significant number of confirmed COVID-19 cases among inmates and staff."  United States v. Hillow, 15-cr-170-JD, Order dated June 2, 2020, p. 3-4 (citing www.bop.gov/coronavirus, last visited May 29, 2020; Martinez-Brooks v. Easter, 2020 WL 2405350, at *27 (D. Conn. May 12, 2020)).  On April 3, 2020, Attorney General William Barr issued a memorandum for the Director of the Bureau of Prisons with the subject:  "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic."  Doc. 80-1.  In that memorandum, Attorney General Barr acknowledged a significant number of COVID-19 cases at FCI Danbury, found that an emergency existed, and directed the Bureau of Prisons to maximize transfers from FCI Danbury to home confinement.  Id. at 2.

---

[1] The Defendant began the process to apply to the RDAP on February 24, 2020.  The Defendant also understands that he if and/or when the RDAP starts again, he will be ineligible to participate in it due to his too-soon release date to the half-way house.

5

18. On April 27, 2020, inmates at FCI Danbury filed a petition for a writ of habeas corpus as a putative class action under 28 U.S.C. § 2241, seeking relief related to the risks presented by COVID-19 in that facility. Martinez-Brooks v. Easter, 2020 WL 2405350, at *1-*2 (D. Conn. May 12, 2020). In that case, the court noted while issuing a temporary injunction that there are significant number of positive COVID-19 cases in that facility and that the facility has experienced difficulty in coping with the spread of the disease. Id. at *4-*9. The court noted that the facility's implementation of AG Barr's directive to place inmates on home confinement has been slow and inflexible. Id. at *22. Further, the court there found, "by failing to make meaningful use of her home confinement authority, the Warden has failed to implement what appears to be the sole measure capable of adequately protecting vulnerable inmates – a measure the Attorney General directed the BOP to implement 'immediately' and with 'dispatch.' Id. at *23.

19. As recently as last week, FCI Danbury had been placed in 'lockdown' for approximately 24 hours as a result of fears of the virus spreading throughout the institution. For a short period of time, inmates were not allowed to have contact with anyone outside the facility. According to the Defendant, every inmate at FCI Danbury was subject to a screening for COVID-19, however the Defendant questions the efficacy of such screening. Of particularly concerning note, the Defendant's bunkmate recently tested positive for COVID-19.

20. Although the PSR indicates that the Defendant reported that he did not have any significant health conditions, nobody was aware of COVID-19 at the time the Defendant submitted to the PSR interview. The Defendant uses an inhaler for breathing difficulties. Two years ago, his primary care physician prescribed him an inhaler due to his breathing

6

difficulties. The doctor prescribed him Proair,[2] which is a generic form of Albuterol. The source of these breathing difficulties has yet to be specifically diagnosed, but the Defendant submits that the difficulties increase when he experiences more-than-average anxiety. Once he arrived at FCI Danbury, he requested a medical appointment and an inhaler. That was before COVID-19 was spreading at an exponential rate inside BOP facilities. The Defendant still has not yet seen a doctor or been prescribed an inhaler.

21. By way of a further offer of proof, the Defendant informs this Court that his anxiety due to incarceration, but especially fear of contracting COVID-19, has greatly increased in recent months. Added to this mental health trauma, the Defendant recently learned that his best friend committed suicide. This has further exacerbated the Defendant's mental health concern as he has no real opportunity to process this devastating loss. Further, his breathing difficulties have substantially increased, as well. He has requested to see a mental health professional in addition to obtaining an inhaler, but he has received no response to that request either. Of note in this regard, the plaintiffs in the *Martinez-Brooks* matter recently filed a pleading asserting that FCI Danbury has been destroying sick/medical call slips/requests from inmates at the facility until recently. Thus, the institution has destroyed the evidence of the Defendant's calls for help for his physical and mental health.

22. The Defendant's parents report that the Defendant's anxiety, and as such his breathing difficulties, increase every day. Further, counsel understands that inmates who are symptomatic do not report this to BOP officials for fear that they will be put into quarantine or isolation, and thus have no contact with families and otherwise be greatly restricted inside

---

[2] The Defendant and his mother can testify to this.

the subject BOP facility. Both of the Defendant's parents would testify that they are incredibly concerned about their son's mental and physical wellbeing such that it is a crisis.

## Legal Argument

23.     The First Step Act's (FSA's) 'compassionate release' provision grants the sentencing court the power to reduce a prisoner's sentence when extraordinary and compelling reasons warrant such a reduction. Pursuant to 18 U.S.C. § 3582(c)(1)(A), that statute provides, in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the term of imprisonment), after considering the factors set forth in section 3553(a) to the extent they are applicable, if it finds that –
>
>     (i)    extraordinary and compelling reasons warrant such a reduction
>
> . . .
>
> and that such a reduction is consistent with appliable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A); see also U.S.S.G. § 1B1.13 (sentencing policy guideline statement on compassionate release). The Court has such power whenever the Director of the Bureau of Prisons makes the motion or "the lapse of 30 days from the receipt of [a] request by the warden of the defendant's facility…." Id.

24.     As more than 30 days have lapsed since receipt by the warden of the Defendant's facility of his request for release to home confinement, this motion is properly

8

before this Court. As such, this Court may now determine if the Defendant is eligible for release to home confinement.

25. The statutory language contemplates "extraordinary and compelling reasons" warranting release in this context and that the Court consider the factors set forth in 18 U.S.C. § 3553(a) to the extent applicable, and that any reduction in sentence be "consistent" with the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). The Sentencing Commission's policy statement regarding such release adds the requirement that the Court find that the Defendant is not likely to pose a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); see U.S.S.G. § 1B1.13, 18 U.S.C. § 3142(g) (listing factors court should consider in determining whether any conditions of release exist that will "reasonably assure … the safety of any other person and the community").

26. In summary, a court may reduce a term of imprisonment under the compassionate release provision if it: (1) finds that extraordinary and compelling reasons warrant the reduction; (2) finds the defendant is not likely to be a danger to the safety of another person or the community; and (3) considers the sentencing factors outlined in 18 U.S.C. § 3553(a). See 18 U.S.C. 3582(c)(1)(A); U.S.S.G. § 1B1.13; see also United States v. Sapp, No. 14-CR-20520, 2020 WL 515935, at *2 (E.D. Mich. Jan. 31, 2020); United States v. Willis, 382 F.Supp.3d 1185, 1187 (D.N.M. 2019). In light of a defendant's burden here, the Court has "broad discretion in deciding whether to grant or deny a motion for sentence reduction." United States v. Paul Gileno, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *2 (D. Conn. Mar. 19, 2020) (internal quotation marks omitted).

27.     Ahmad submits that there are several reasons that warrant his release to home confinement. Initially, his ignored medical requests for an inhaler demonstrate that he is at risk of experiencing severe illness if he contracts COVID-19. He further submits that he has an increased risk of becoming infected with the virus because inmates and staff at FMC Danbury have tested positive, including his bunkmate.[3] Of note, any record of the Ahmad's repeated requests for medical call to obtain an inhaler have been destroyed by BOP prior to on or about June 2, 2020.

28.     As well, Ahmad's requests to see someone for mental health services have been ignored, and his anxiety due to COVID-19 exposure increases with each passing day. Added to this is the circumstance that Ahmad has no idea when or if he will be able to enter into the RDAP, and if he is admitted whether he will be able to participate in it due

---

[3] Inmates are at a heightened risk of contracting COVID-19 should an outbreak develop in a custodial facility. *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/ 521910; *see also* Kimberly Kindy, Emma Brown, Dalton Bennett, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons face Coronavirus Threat*, https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html, Washington Post (Mar. 25, 2020); U.S. Senators' Letter to Attorney General Barr and Director of the Federal Bureau of Prisons Carvajal, *available at* https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20 and%20BOP%20 on%20COVID-19%20and%20 FSA%20provisions%20-%20final%20bipartisan%20text %20with%20signature%20blocks.pdf (Mar. 23, 2020); Claudia Lauer & Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, Associated Press (Mar. 7, 2020).

On April 1, 2020, the BOP implemented a new phase of its "Action Plan" designed to respond to the COVID-19 pandemic. *See* https://www.bop.gov/resources/ news/20200331_covid19_action_plan _5.jsp (Mar. 31, 2020). The plan provides, among other things, that "[f]or a 14-day period [beginning April 1], inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus." *Id.* The BOP's measures, however well intentioned, likely increased Ahmad's risk of exposure to the virus. Confined in a minimum-security prison camp, where he resides in "dormitory housing," *see* https://www.bop.gov/about/ facilities/federal_prisons.jsp, he was literally warehoused in a large room with up to 140 other inmates. The beds are arranged such that the inmates sleep about two to four feet apart from one another. Such communal-living conditions were ripe for the quick spread of COVID-19. Most importantly, the BOP's new limitations on inmate mobility do not even purport to address the most likely source of community spread of the disease in prison: the comings and goings of prison staff. *See, e.g.*, Robin McDowell, Margie Mason*, Locked Up: No Masks, Sanitizer as Virus Spreads Behind Bars*, Associated Press, https://apnews.com/4e1e4ffaeb6bf9a9fabcc 566fe5b110d (Mar. 30, 2020) ("[J]ail and prison employees are . . . the ones most likely to bring the virus into . . . facilities….").

10

insufficient time on remaining on his sentence when he would be scheduled to begin it. Lastly in this regard, the BOP has established a protocol/regulation that qualifying inmates (of which Ahmad is one) are entitled to certain time off their incarcerated sentences for completing RDAP. The Defendant submits this is commonly known by the courts and government, and that it may have been a factor in the Court's sentencing decision. As it stands now, it appears that Ahmad will not be able to receive any credit if the RDAP re-opens, if he is allowed to enter, and if he has enough time to complete it before he is moved to a half-way house.

29. The Commentary to the Sentencing Guidelines Policy Statement regarding such release identifies four categories of "extraordinary and compelling reasons" that justify a sentence reduction: defendant's medical condition; defendant's age; defendant's family circumstances; and a catchall category. U.S.S.G. § 1B1.13, App. Note 1. The catchall category encompasses any "extraordinary and compelling reason other than, or in combination with" the other noted factors. See U.S.S.G. § 1B1.13, App. Note 1(D). In this regard, the Court's discretion is not constrained by the definition of "extraordinary and compelling reasons" in the Bureau of Prison's program statement on compassionate release. The Sentencing Guidelines currently define the catchall category as being "determined by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13, App. Note 1(D). However, this provision has not been amended since the passage of the First Step Act. As such, a portion of the policy statement now squarely contradicts 18 U.S.C. § 3582(c)(1)(A) as amended. United States v. Perdigao, No. CR 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020). This discrepancy means that the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step

11

Act.  Id.  Numerous courts have ruled that they have discretion to determine what constitutes an 'extraordinary and compelling reason' on a case-by-case basis, and reliance on the policy may be helpful, but it is not dispositive.  Id.

30. Congress did not define what would constitute an "extraordinary and compelling reason" warranting the reduction of a sentence under § 3582(c).  Instead, the legislative history confirms that Congress intended to grant sentencing courts broad discretion to make those determinations on a case-by-case basis and to reduce fundamentally unfair sentences where such reasons exist.  Congress's initial goal in passing the Comprehensive Crime Control Act of 1984 was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53 n.74 (1983).  But, Congress recognized that the elimination of parole as a corrective measure in cases where early release is warranted created a need for an alternative review process, and therefore allowed for judicial reduction of certain sentences under § 3582(c).  Id. at 55-56.  The situations listed in § 3582(c) were thus intended to serve as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system.  Id. at 121.  This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and permitted "later review of sentences in particularly compelling situations."  Id.  Notably, Congress imposed no limitations on courts' authority to make such determinations, declining to define what constitutes "extraordinary and compelling reasons" or to otherwise constrain judges' discretion. The mandate was simple: if extraordinary and compelling circumstances were present, they would "justify a reduction of an unusually long sentence." Id. at 55-56 (1983).

31. As discussed, in 2018 Congress enacted the First Step Act, which was expressly designed to "[i]ncreas[e] the use and transparency of compassionate release" under § 3582. *See* P.L. 115-391, 132 Stat. 5194, at § 603(b). The amendment to § 3582(c) reduced the BOP's gatekeeping role—previously, relief could be granted *only* after a BOP motion—but otherwise left unchanged the courts' discretion to grant relief in appropriate circumstances. *Redd*, 2020 U.S. Dist. LEXIS 45977 at *16. Accordingly, "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist…." Id. at *18-19.

32. Therefore, this Court should endorse and agree with those courts that have held that the Sentencing Guideline policy statement "provides helpful guidance" but "does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)." United States v. Rich, 17-CR-094-LM, 2020 DNH 095, at *5 n.1) (D.N.H. June 2, 2020) (citing United States v. Beck, 425 F.Supp.3d 573, 579 (M.D.N.C. 2019); see also United States v. Bucci, 409 F.Supp.3d 1, 2 (D. Mass. 2019); United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 304086, at *3 (D. Me. July 11, 2019)).

33. In the context of the current pandemic, courts have held that a generalized risk of infection by the virus is not, by itself, sufficient constitute an extraordinary and compelling reason warranting release. Id. at *5-6 (citing United States v. Ramirez, No. CR-17-10328-WGY, 2020 WL 2404858, at *3 (D. Mass. May 12, 2020) (collecting cases)). In determining whether a prisoner is at a particularly high risk of experiencing severe illness from COVID-19, courts have generally looked to the Centers for Disease Control and Prevention ("CDC") guidelines. Id. (citing United States v. Ullings, No. 1:10-CR-00406,

13

2020 WL 2394096, at *1 (N.D. Ga. May 12, 2020); United States v. Dunlap, No. 1:02CR165-1, 2020 WL 2062311, at *2 (M.D.N.C. Apr. 29, 2020)). The CDC emphasizes that "COVID-19 is new a disease and there is limited information regarding risk factors for severe disease." Id. (citing CDC article). The CDC has identified certain categories of people as being at "high-risk for severe illness from COVID-19," including "[p]eople of all ages with underlying medical conditions, particularly if not well controlled, including … moderate to severe asthma…." Id.

34. As previously stated, due to Ahmad's breathing difficulties, he has requested an asthma inhaler since he was first admitted to FCI Danbury. This request has been ignored. Also, the risk that Ahmad will contact COVID-19 while incarcerated at FCI Danbury is more than speculative. Many courts, including this Court, have recognized that the nature of the prison environment itself enhances the likelihood that prisoners will catch this highly contagious virus. Id. at *10 (citing Gomes v. US Dep't of Homeland Sec., Acting Sec'y et al., No. 20-CV-453-LM, 2020 WL 2514541, at *4 (D.N.H. May 14, 2020); Bischoff, 2020 WL 2561423, at *2 (collecting cases)). This is especially true where there is already a documented outbreak at a facility like FCI Danbury. As of today's date, according to the BOP's website, there are 20 inmates and two staff who are currently suffering active cases of COVID-19. See BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited June 11, 2020) (FCI Danbury Facility).

35. The Court should find that all of the factors at issue in the Defendant's current situation – his need based upon his multiple requests for an inhaler, the ignoring of that request, his need for mental health counseling based upon his request for such counseling, the ignoring of that request, the increased likelihood that he will contract the virus at FCI

14

Danbury, his likely inability to participate in RDAP, and the apparent impossibility of his receiving any considered 'good time' credit for completion of RDAP.  Just as importantly, there is currently no programming whatsoever, inmates are not allowed visits, and they are not allowed outside for 24 to 48 hours at a time.  Ahmad's current incarceration is more restrictive and punitive than originally considered when the Court sentenced him.

36. The Defendant is working to obtain a verified re-entry plan through his case manager at the prison at the time of this filing.  He expects that to be available in the near future.  Also, he will be able to be employed at the same job he had while on pretrial release in this matter (Cooper Hill Pizzeria) if released to home confinement.  See Letter Dated May 28, 2020 (attached hereto as Exhibit B).  As well, he will be able to resume mental health counseling in which he regularly participated on pretrial release but has not had while at the prison.  See Letter Dated June 5, 2020 (attached hereto as Exhibit C).

37. The Defendant is not a danger to the safety of others or the community.  He was a very young man when he committed the subject crime in this case.  He has been incarcerated for several months, and now his life is potentially at risk.  He has been ignored by the BOP in his efforts to address his medical concerns, and he is a massive risk to contract COVID-19.  At the time of this offense, the Defendant struggled with mental health and substance abuse issues, and he did not engage in anything that could be characterized as violent behavior.  As well, it appears from the Defendant's pretrial adjustment that he is highly unlikely to reoffend.

38. Finally, the Court must consider whether a reduction in the Defendant's incarcerated sentence is consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) to the extent they are applicable.  See 18 U.S.C. § 3582(c)(1)(A).  Specifically, the

Court will consider whether the § 3553(a) factors support a reduction in the Defendant's sentence, or, alternatively, whether they outweigh the "extraordinary and compelling reasons" discussed above and compel denial of the motion.  See, e.g., United States v. Webster, No. 3:91CR138 (DJN), 2020 WL 91399, at *7.

39. This Court should find that the § 3553 factors support a reduction in the Defendant's sentence.  As reflected in prior filings, the Defendant entered and successfully completed the inpatient substance abuse treatment program at Concord Hospital, and then he successfully completed all phases of the Intensive Outpatient Program (IOP) through Concord Hospital.  As well, Ahmad became a patient at Seacoast Mental Health Center beginning on 1/31/19.  He has attended regular therapy since that date until his incarceration.  Further, Ahmad was regularly employed and has successfully passed every drug screen during pretrial supervision.  He has a minimal and non-violent criminal history prior to this matter.  As demonstrated here, the Defendant does not pose a danger to the community.  Ordering the Defendant released to home confinement for a period of time at the Court's discretion followed by supervised release with conditions to include mental health treatment, substance abuse treatment, employment, and any other conditions the Court deems appropriate.

41. Ahmad would be able to quarantine at his mother's residence where he resided during pretrial supervision.  After that, Ahmad would be able to re-engaged in much needed mental health counseling as well as substance abuse counseling.  Right now, there is absolutely no rehabilitative aspect to the Defendant's incarceration, he is subject to greater restrictions than anticipated, his mental health is suffering, he is exposed to what could be an incredibly debilitating (if not deadly) disease, and he is unable to engage in any type of

programming.  The Court can effectuate a punishment and institute rehabilitative efforts if it places him on home confinement.

42.     Due to the nature of the relief requested here, the Defendant did not seek the position of the government as counsel believes the government objects to this relief.

Wherefore, Ahmad Khawaja, through counsel, respectfully requests that the Court grant the relief requested, specifically that the Court amend his sentence to home confinement to a term determined appropriate by the Court, combined with any other conditions the Court or Probation deem appropriate or necessary.  Should the Court not be inclined to grant the Defendant's request on an immediate basis, he asks that the Court place him on home confinement for the period of 'good time' credit he would have otherwise earned for completing RDAP.

Finally, the defense requests any such other relief as may be deemed just and equitable.

Respectfully submitted,

Ahmad Khawaja
By and through his counsel,

DATED:  June 12, 2020                    /s/Charles J. Keefe
                                         Charles J. Keefe (N.H. Bar No. 14209)
                                         Wilson, Bush & Keefe, P.C.
                                         378 Main Street
                                         Nashua, NH 03060
                                         (603) 595-0007
                                         keefe@wbdklaw.com

## Certificate of Service

    I, Charles J. Keefe, hereby certify that true copies of the above document were delivered to AUSA John Davis and the United States Probation Office.

                                            /s/Charles J. Keefe
                                            Charles J. Keefe