UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

     v.　　　　　　　　　　　Criminal No. 18-cr-127-LM
　　　　　　　　　　　　　　　　　Opinion No. 2020 DNH 158 P
Ahmad Khawaja

**O R D E R**

Ahmad Khawaja renews his motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), arguing that his underlying health conditions combined with the threat of contracting COVID-19 while incarcerated at the Federal Correctional Institution ("FCI") Danbury warrant his release. The court previously denied without prejudice defendant's motion for compassionate release because defendant had not exhausted his administrative remedies and had failed to demonstrate through medical records or other proof that he has a medical condition that puts him at higher risk of experiencing severe illness should he contract COVID-19. Defendant has submitted medical records in support of his renewed motion. The government concedes that defendant has exhausted his administrative remedies but objects to his release. The court held a video hearing on defendant's renewed motion on July 22, 2020, at which defendant and his mother, Susan Bedard, testified.

## STANDARD OF REVIEW

A court may grant so-called "compassionate release" to a defendant under 18 U.S.C. § 3582(c)(1)(A). The statute provides, in relevant part, that:

> [T]he court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A); see also U.S.S.G. § 1B1.13 (sentencing guidelines policy statement on compassionate release).

Where, as here, a motion for compassionate release is properly before the court, the court must determine if defendant is eligible for release. The statutory language quoted above requires that defendant show that "extraordinary and compelling reasons warrant" a reduction in his sentence, that the court consider the factors set forth in 18 U.S.C. § 3553(a) to the extent applicable, and that the reduction be "consistent" with the Sentencing Commission's applicable policy statements. 18 U.S.C. § 3582(c)(1)(A). The Sentencing Commission's policy statement regarding compassionate release mirrors the statutory language and

adds the requirement that the court find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).  A defendant's dangerousness is a paramount concern as a court weighs the decision to grant a defendant early release.  See United States v. Bradshaw, No. 1:15-CR-422, 2019 WL 7605447, at *3 (M.D.N.C. Sept. 12, 2019) (explaining overlap between dangerousness requirement in compassionate release policy statement and § 3553(a) requirement that court consider the need to protect the public).

In short, a court may reduce a term of imprisonment under the compassionate release provision if it: (1) finds that extraordinary and compelling reasons warrant the reduction; (2) finds that the defendant will not pose a danger to the safety of any other person in the community; and (3) considers the sentencing factors outlined in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13; see also United States v. Rasberry, No. 2:15-CR-00127-JDL, 2020 WL 3977614, at *1 (D. Me. July 14, 2020); United States v. Hilow, No. 15-CR-170-JD, 2020 WL 2851086, at *1 (D.N.H. June 2, 2020). The defendant bears the burden of showing that he is entitled to a sentence reduction. Hilow, 2020 WL 2851086, at *3. And the court has "broad discretion in deciding whether to grant or deny a motion for sentence reduction." United States v. Britton, Crim. No. 18-cr-108-LM, 2020 WL 2404969, at *2 (D.N.H. May 12, 2020) (internal quotation marks omitted).

## BACKGROUND

On July 12, 2018, defendant was arrested for importation of a controlled substance (MDMA). Magistrate Judge Johnstone ordered defendant detained pending placement in a residential drug treatment program. On July 25, 2018, defendant was released on pretrial supervision with conditions, including successful completion of an inpatient substance abuse treatment program.

On May 2, 2019, defendant pleaded guilty to one count of importation of a controlled substance (MDMA) in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(3). On January 3, 2020, the court sentenced defendant to 30 months of imprisonment and recommended that he participate in the Residential Drug Abuse Program ("RDAP") while incarcerated. On February 20, 2020, defendant self-surrendered to FCI Danbury in Connecticut where he remains incarcerated.

On April 9, 2020, defendant moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on the threat to his health posed by the spread of COVID-19 in prisons and his breathing difficulties. He argued that the court could excuse the statutory requirement of exhaustion of administrative remedies under certain circumstances. The court concluded that, even assuming without deciding that it had the power to excuse the exhaustion requirement under certain circumstances, defendant had not shown that his case presented such circumstances. The court reasoned that excusal of the exhaustion requirement was not warranted because defendant had not submitted sufficient proof that he suffers from a medical condition that places him in a high-risk category under the Centers for Disease

Control and Prevention ("CDC") guidelines. Specifically, although defendant alleged that his primary care physician had prescribed him an inhaler for "breathing difficulties" prior to his incarceration, he did not offer any medical records supporting that contention. Defendant also admitted that his physician had not diagnosed the source of his breathing difficulties. For these reasons, the court found that excusal of the exhaustion requirement was not justified.

Alternatively, the court found that even if it excused the exhaustion requirement, defendant had still failed to demonstrate an extraordinary and compelling reason supporting his release. That conclusion was based on the same reason the court declined to excuse the exhaustion requirement: defendant offered inadequate proof of a medical condition putting him at substantial risk of experiencing severe illness from COVID-19. The court therefore denied defendant's motion without prejudice.[1]

On June 12, 2020, defendant renewed his motion for compassionate release and submitted medical records in support of that motion—records from before and during his incarceration. The government concedes that defendant has exhausted his administrative remedies since his prior motion. As to the merits of the motion, however, the government argues that defendant has not established an

_____

[1] The court subsequently decided in United States v. Britton, Crim. No. 18-cr-108-LM, 2020 WL 2404969, at *9 (D.N.H. May 12, 2020) that the compassionate release provision's exhaustion requirement is mandatory and cannot be excused by the court if raised as a defense by the government.

extraordinary and compelling reason and that the sentencing factors do not support his release.

## DISCUSSION

I.  <u>Extraordinary and Compelling Reasons</u>

There are four categories of "extraordinary and compelling reasons" that justify a sentence reduction in the Commentary to the Sentencing Guidelines Policy Statement regarding compassionate release: defendant's medical condition; defendant's age; defendant's family circumstances; and a catchall category. U.S.S.G. § 1B1.13, App. Note 1. Under the policy statement, a medical condition constitutes an "extraordinary and compelling reason" if defendant is suffering from a terminal illness, or has a serious physical or medical condition, cognitive impairment, or deteriorating physical or mental health due to age "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, App. Note 1(A)(i)-(ii). Under the "catchall" category, a defendant can establish an extraordinary and compelling reason by establishing either (a) a compelling reason for release other than his medical condition, age, or family circumstances, or (b) a reason that in combination with his medical condition, age, or family circumstances constitutes an extraordinary and compelling reason. <u>See</u> U.S.S.G. § 1B1.13, App. Note 1(D).

In the context of the current pandemic, courts have held that a generalized risk of infection by the virus is not, by itself, sufficient to constitute an

extraordinary and compelling reason warranting release. See United States v. Ramirez, No. CR 17-10328-WGY, 2020 WL 2404858, at *3 (D. Mass. May 12, 2020) (collecting cases). "On the other hand, a combination of health and age factors that put a prisoner at a substantially higher risk due to COVID-19 along with a documented risk of the disease in the facility where the prisoner is incarcerated may demonstrate extraordinary and compelling reasons to reduce the prisoner's sentence." United States v. Bischoff, No. 17-CR-196-JD, 2020 WL 2561423, at *2 (D.N.H. May 19, 2020) (collecting cases in support); see also, e.g., United States v. Rich, Crim. No. 17-cr-094-LM, 2020 WL 2949365, at *3-4 (D.N.H. Jun. 3, 2020) (finding that defendant's documented history of bronchitis, reactive airway disease, and smoking combined with current outbreak at the prison constituted extraordinary and compelling reason).

In determining whether a prisoner is at a particularly high risk of experiencing severe illness from COVID-19, courts have generally looked to the CDC guidelines. See, e.g., United States v. Nygren, No. 1:16-CR-00106-JAW, 2020 WL 4208926, at *11-12 (D. Me. July 22, 2020); Rasberry, 2020 WL 3977614, at *3-4. The CDC emphasizes that "COVID-19 is a new disease" and that there is "limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19."[2]  Based on the

---

[2] CDC, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html, (last visited Sept. 16, 2020).

limited information known, the CDC has identified certain categories of people who are at an increased risk for experiencing severe illness from COVID-19: older adults and people of all ages with underlying medical conditions.[3]  Underlying medical conditions that "might" put someone at increased risk include moderate to severe asthma and being a current or former cigarette smoker.[4]

Defendant contends that he has recently been diagnosed with asthma by Bureau of Prisons ("BOP") medical staff and that this condition puts him at substantial risk of experiencing severe illness should he become infected with COVID-19. He also contends that he is at an increased risk of contracting the virus in the first place because of the conditions at FCI Danbury and the past and current infection rates.

Defendant's original motion for compassionate release failed because he did not submit any medical records in support. By contrast, the medical records now before the court demonstrate that defendant is a high-risk inmate because he has asthma and is a former smoker.

First, defendant's medical records demonstrate that—since the court's prior order—BOP medical personnel have diagnosed defendant with asthma. Doc. no. 53

---

[3] CDC, People Who Are at Increased Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html, (last visited Sept. 16, 2020).

[4] CDC, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html, (last visited Sept. 16, 2020).

at 3, 34. Defendant's medical records also clarify that this diagnosis relates to his pre-incarceration symptoms. In March 2018, prior to his incarceration, defendant experienced coughing and wheezing associated with acute bronchitis for which his primary care physician prescribed an albuterol inhaler for use as needed. Doc. no. 53-1 at 74-76. Later that year, defendant visited his physician for treatment of a persistent cough. Id. at 109. He reported that the cough worsened in cold or humid weather and that he would sometimes lose his breath when walking. Id. His physician again prescribed him an albuterol inhaler to be used every 4 to 6 hours as needed. Id. To follow up, his physician ordered a pulmonary function test to be conducted by a pulmonary specialist. Id. at 110, 132. The results of that test were inconclusive; defendant exhibited "normal diffusion capacity" but asthma could not be "ruled out." Id. at 132-33. Defendant's albuterol prescription remained current following that testing. Id. at 175.

Defendant then began his incarceration on February 20, 2020. He testified that during his initial medical intake and physical at FCI Danbury he denied having respiratory issues because he did not have a specific diagnosis. He did, however, explain to BOP medical staff that his physician had prescribed him an inhaler. He was told that he would need to set up a medical appointment to request an inhaler. Defendant testified that between March and June he submitted between six and eight requests for a medical appointment to receive an inhaler, which went unanswered.

9

Defendant was finally seen regarding his request for an inhaler on June 18, 2020. At that appointment, defendant completed a peak flow test which indicated that he needed an inhaler. See doc. no. 53 at 3. Additionally, the medical staff noted that defendant needed to be enrolled in the Chronic Care Clinic. Id. Defendant's BOP medical records reflect that as of June 18, 2020, he has a "current" diagnosis of asthma and that he was prescribed an albuterol inhaler to be used up to 4 times a day. Id. at 2, 34.  Defendant testified that he uses his inhaler about once a day. He also testified credibly that his asthma worsens when he experiences greater than average anxiety. Understandably, defendant has experienced severe anxiety related to the pandemic and the spread of the virus within FCI Danbury. His anxiety has, in turn, exacerbated his asthma.

In addition to having a diagnosis of asthma, defendant has a long-time history of heavy cigarette smoking. His medical records reflect that he started smoking cigarettes at age 13 and quit in or around October 2019, at age 22. See doc. no. 53 at 21; doc. no. 53-1 at 81, 112. Even after quitting smoking, defendant continued vaping until his incarceration. See doc. no. 53-1 at 112, 174.

The medical records defendant submitted in support of his renewed motion provide adequate evidence that defendant has two conditions that expose him to greater risk of severe illness from COVID-19: asthma and being a former smoker. The fact that defendant has two co-existing high-risk conditions further increases his risk because "[t]he more underlying medical conditions someone has, the greater

their risk is for severe illness from COVID-19."[5]  See also Hilow, 2020 WL 2851086, at *4 (observing that the "collective risk" of a defendant's several non-serious medical conditions combined with an outbreak at the prison can satisfy the extraordinary and compelling standard). Defendant's documented history of smoking combined with his asthma convince the court that defendant is at a substantially higher risk of experiencing severe illness or complications should he become infected with COVID-19.

The court is not persuaded by the contrary opinion of the government's medical expert. Based on his review of defendant's pre-incarceration medical records, the government's expert opined that defendant does not fall within a high-risk category. See doc. no. 52. It does not appear, however, that the government's expert had the benefit of reviewing defendant's BOP medical records, which contain the asthma diagnosis. Moreover, the court does not find the government's expert's assessment particularly credible. He failed to identify defendant's history as a former smoker (which was evident from his pre-incarceration medical records) as a risk factor to consider as part of his assessment. The court therefore remains convinced that defendant has demonstrated that his medical conditions and history make him vulnerable to severe illness from COVID-19.

---

[5] CDC, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html, (last visited September 16, 2020).

Defendant has also shown that the risk that he will become infected with COVID-19 while incarcerated is more than speculative. Many courts, including this one, have recognized that the nature of the prison environment itself enhances the likelihood that prisoners will catch this highly contagious virus. See Gomes v. US Dep't of Homeland Sec., Acting Sec'y et. al., No. 20-CV-453-LM, 2020 WL 2514541, at *4 (D.N.H. May 14, 2020); Bischoff, 2020 WL 2561423, at *2 (collecting cases). That is especially true where there is already a documented outbreak at the prison.

At FCI Danbury, 85 inmates and 64 staff members have recovered from the virus and one inmate has died.[6]  These numbers reflect that at one time FCI Danbury experienced a "serious outbreak" of the virus. Martinez-Brooks v. Easter, ___ F. Supp. 3d ___, 2020 WL 2405350, at *20 (D. Conn. May 12, 2020) (class action habeas suit on behalf of all inmates at FCI Danbury, alleging a claim of deliberate indifference against BOP for failure to use all available avenues to reduce prison population to protect against COVID-19). Based on BOP's website, however, that outbreak appears to be largely contained at the present time. As of September 16, BOP reported two positive inmates and zero positive staff members at FCI Danbury.[7]

Nonetheless, a prison by nature of its size, the number of inmates, and the difficulty of keeping inmates physically distant from one another is a potential

---

[6] BOP, COVID-19, https://www.bop.gov/coronavirus/, (Danbury FCI Facility) (last visited Sept. 16, 2020).

[7] BOP, COVID-19, https://www.bop.gov/coronavirus/, (Danbury FCI Facility) (last visited Sept. 16, 2020).

"tinderbox" for this contagious virus. See Gomes, 2020 WL 2514541, at *4; see also United States v. Tate, No. 17-CR-30037, 2020 WL 3791467, at *4 (C.D. Ill. July 7, 2020) (collecting cases finding extraordinary and compelling circumstances even when facility does not have confirmed cases of COVID-19). Importantly, defendant has recently updated the court that his bunkmate has tested positive for COVID-19 and was taken to the hospital. See doc. no. 59. Considering all the above facts, the court finds that defendant has shown a particularized risk that he could contract COVID-19 while incarcerated.

In sum, the court finds that defendant's high-risk medical conditions combined with the increased likelihood that he could contract the virus while at FCI Danbury constitute extraordinary and compelling reasons supporting his release.

II.     Sentencing Factors

Next, the court must consider whether a reduction in defendant's sentence is consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) to the extent they are applicable. See 18 U.S.C. § 3582(c)(1)(A). The § 3553(a) factors a court must consider at sentencing include the nature and circumstances of the defendant's offense and the defendant's personal history and characteristics. 18 U.S.C. § 3553(a)(1). Section 3553(a) requires that the court ensure that the sentence imposed reflects the seriousness of the offense that was committed, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public from further crimes of the defendant, and provides the defendant with needed training, medical care, and other treatment in the most effective way. 18

U.S.C. § 3553(a)(2). Section 3553(a) further requires the court consider the kinds of sentences available, the Sentencing Guidelines, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(3)-(7).

The court assesses the relevant sentencing factors below. After considering the applicable § 3553(a) factors, the court will consider whether those factors support a reduction in defendant's sentence, or, alternatively, whether they outweigh the "extraordinary and compelling reasons" discussed above and compel denial of the motion. See, e.g., United States v. Tidwell, ___ F. Supp. 3d ___, 2020 WL 4504448, at *6 (E.D. Pa. Aug. 5, 2020); United States v. Daugerdas, ___ F. Supp. 3d ___, 2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020).

A.  Need to Protect the Public and Nature and Circumstances of the Offense

Defendant committed a serious drug-trafficking offense using sophisticated means. He purchased MDMA on the "dark web" from a seller in France, had the drugs shipped into the United States, and enlisted other people to receive the packages of drugs for him to avoid detection.

This criminal conduct was driven in part by defendant's substance abuse issues. Starting at a young age, defendant abused a variety of different drugs. See doc. no. 31 at 11-12 (presentence investigation report). Following his arrest and during his nineteen-month pretrial release, however, defendant took steps to get his substance abuse issues under control and rehabilitate himself. He successfully

completed an intensive, inpatient substance abuse treatment program as a condition of his pretrial release. For the duration of his pretrial release, he submitted no positive drug tests. Rather, he submitted approximately 20 negative drug tests during that time. During pretrial release defendant also began receiving mental health treatment on a monthly basis, maintained steady employment, and received positive reviews from his employer. Defendant's positive choices and lawful behavior on pretrial release mitigate his dangerousness and the likelihood he will reoffend and demonstrate that he is likely to comply with the conditions of any release.

Other than the instant federal offense, defendant has a minimal criminal record. He has two state misdemeanor convictions for possession of controlled substances, which resulted in a criminal history category of II under the Sentencing Guidelines. Given this criminal history, the government did not contend that defendant poses a danger to the community.

In light of his minimal criminal history, his record of compliance during pretrial release, and his efforts to address the root causes of his criminal behavior, the court finds that defendant is not likely to pose a danger to the safety of any person or to the community if released on conditions. Cf. Delacruz v. United States, Civ. No. 18-cv-811-LM, 2020 WL 3270503, at *4-5 (D.N.H. Jun. 17, 2020) (denying compassionate release where defendant was sentenced on federal drug trafficking offenses as a career offender after engaging in a pattern of similar yet escalating drug offenses of the course of two decades). Put differently, there is little need to

protect the public from further crimes of this defendant. Thus, the court's consideration of the need to protect the public and of defendant's offense support his release. See 18 U.S.C. § 3553(a)(1), (2)(C).

      B. <u>Provision of Needed Educational or Vocational Training, Medical Care, or Other Treatment in Most Effective Manner</u>

As outlined above, defendant made great progress during pretrial supervision with the help of substance abuse treatment, mental health treatment, and stable employment. At present, defendant is unable to access any resources like those that helped him succeed while on pretrial release. Significantly, he has been unable to enroll in the RDAP program. The prison has suspended that substance use treatment program due to COVID-19, except for inmates who were already enrolled in the program at the outset of the pandemic. Were defendant to successfully complete the RDAP program, and, assuming he received his good time credits, his projected release to a halfway house would be in approximately one year, in September 2021.  However, because of the situation in the prison, defendant will not be able to avail himself of the rehabilitative programming recommended by the court at the time of sentencing or accrue early release with successful completion.

Further, defendant testified that almost no educational or vocational programs are currently available due to the lockdown necessitated by the pandemic. At this point, defendant's incarceration is failing to provide him educational and vocational training or experience, substance abuse treatment, and mental health treatment in any manner, let alone "in the most effective manner." 18 U.S.C. §

3553(a)(2)(D). Indeed, if defendant were to complete his term of imprisonment without rehabilitative programming, he would be more likely to return to criminal behavior and drug use upon release from that sentence than he was at the time he became incarcerated. See United States v. Schafer, 6:18-CR-06152 EAW, 2020 WL 2519726, at *7 (W.D.N.Y May 18, 2020) (explaining that sentencing factors favored compassionate release in part because the lack of treatment and programming in the prison made it more likely that defendant would eventually return to illegal drug use if he remained incarcerated); United States v. Adeyemi, No. CR 06-124, 2020 WL 3642478, at *18, *26 (E.D. Pa. July 6, 2020) (granting release and noting that defendant was unable to exercise as treatment for his asthma).

The court therefore finds that defendant's release to home confinement is the best way for him to access the substance abuse treatment, mental health treatment, and employment opportunities that helped him get back on the right track following his arrest.[8]  This finding weighs heavily in favor of defendant's release.

C.  Seriousness of the Offense, Adequate Deterrence, Respect for the Law,
     and Just Punishment

The government argues that releasing defendant after he served only 6 months of a 30-month sentence would not promote respect for the law or provide just punishment. See 18 U.S.C. § 3553(a)(2)(A). It is true that defendant has served only a small portion of his original sentence. However, if defendant were to complete

---

[8] Defendant's employer even submitted a letter indicating that defendant would be welcomed back to his old position if released. Doc. no. 48-2.

the drug treatment program that the court recommended at his sentencing hearing, defendant's release date to a halfway house (assuming good time credits) would be approximately one year from now.[9]

Prior to this conviction, the defendant had not served one day in jail or prison. For a young defendant who has never served any time in custody, six months in a federal prison is significant—especially considering that defendant has served most of that time on lockdown and in fear of contracting COVID-19. He has no history of violence. His drug addiction contributed to his having committed this serious drug crime, and, prior to his sentencing, he took positive steps to address his drug addiction. Should he remain in prison without receiving any further drug treatment, or any other rehabilitative programming, he may well be released a more dangerous person than when he went into prison. This is a result inconsistent with the goals of sentencing.

For these reasons, the court finds that the sentencing factors regarding the seriousness of the offense, deterrence, respect for the law, and just punishment do not weigh against release in this case.

D. Weighing the Sentencing Factors Against the Extraordinary and Compelling Reasons

Finally, the court weighs the sentencing factors against the strength of defendant's extraordinary and compelling reasons for release. See Tidwell, 2020 WL

---

[9] All indicators point to defendant receiving his good time credits and, if given the opportunity, successfully completing the drug treatment program.

4504448, at *6; Daugerdas, 2020 WL 2097653, at *4. Defendant's underlying health issues (asthma and history of smoking) combined with the present risk of infection at FCI Danbury put him at a substantially high risk of contracting the virus and suffering severe illness or death. These extraordinary and compelling reasons weigh in favor of release. Further, defendant's minimal criminal history and demonstrated efforts to rehabilitate himself show that he is not likely to be a danger to the community if released on conditions. Most critically, defendant demonstrated while on pretrial release that—with the right treatment and support—he can succeed in leading a sober and law-abiding life. Without access to those services while in prison, the court is concerned that a continued term of incarceration could cause defendant to backslide and lose the progress he made while on pretrial release. The court finds therefore that defendant's need for ongoing substance abuse treatment, mental health treatment, and employment opportunities, which are currently unavailable at FCI Danbury, weighs most heavily in favor of his release.

Considering all these factors, the court finds that defendant has met his burden of showing that he is entitled to a sentence reduction under § 3582(c)(1)(A). A reduction of defendant's sentence to time served followed by a special term of supervised release on home confinement until March 24, 2022, will best serve the goals of sentencing as outlined above.

## CONCLUSION

For the foregoing reasons, defendant's renewed motion for compassionate release (doc. no. 48) is granted as follows:

1) The defendant's sentence will be reduced to time served.

2) The defendant will be placed on a special term of supervised release until March 25, 2022, which is equivalent to what his discharge date would have been from the BOP, during which time he will remain on home confinement under the terms of release outlined in Appendix A.

3) Following the term of special supervised release, the defendant will be placed on supervised release for a term of three years.

4) During the terms of special supervised release and supervised release, the defendant shall be subject to the Supervision Conditions as set forth in Appendix A.

5) The BOP shall release the defendant immediately following processing.

6) The court recommends that the BOP screen the defendant for COVID-19 within twelve hours prior to his release, and if he is displaying symptoms consistent with COVID-19, test the defendant and share the results with the United States Probation Office in the District of New Hampshire.

7) The court will issue an amended criminal judgment.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 16, 2020

cc:  Counsel of Record
     U.S. Probation
     U.S. Marshal

## APPENDIX A

**SUPERVISION CONDITIONS:**

Within seventy-two hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the district to which the defendant is released.

While under supervision, the defendant must comply with the following mandatory conditions:

The defendant must not commit another federal, state, or local crime.

The defendant must not unlawfully possess a controlled substance.

The defendant must refrain from any unlawful use of a controlled substance. The defendant must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

The defendant must cooperate in the collection of DNA as directed by the probation officer.

While under supervision, the defendant must also comply with the following standard conditions of supervision that have been adopted by this court:

1. The defendant must report to the probation office in the federal judicial district where he is authorized to reside within 72 hours of his release from imprisonment, unless the probation officer instructs him to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when he must report to the probation officer, and he must report to the probation officer as instructed.

3. The defendant must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the court or the probation officer.

4. The defendant must answer truthfully the questions asked by his probation officer.

1

5. The defendant must live at a place approved by the probation officer.  If he plans to change where he lives or anything about his living arrangements (such as the people he lives with), the defendant must notify the probation officer at least 10 days before the change.  If notifying the probation officer in advance is not possible due to unanticipated circumstances, the defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. The defendant must allow the probation officer to visit him at any time at his home or elsewhere, and he must permit the probation officer to take any items prohibited by the conditions of his supervision that the probation officer observes in plain view.

7. The defendant must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses him from doing so.  If the defendant does not have full-time employment he must try to find full-time employment, unless the probation officer excuses him from doing so.  If the defendant plans to change where he works or anything about his work (such as his position or his job responsibilities), the defendant must notify the probation officer at least 10 days before the change.  If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. The defendant must not communicate or interact with someone he knows is engaged in criminal activity.  If the defendant knows someone has been convicted of a felony, he must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

 9. If the defendant is arrested or questioned by a law enforcement officer, he must notify the probation officer within 72 hours.

10. The defendant must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the
specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. The defendant must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require him to notify the person about the risk and he must comply with that instruction.  The

probation officer may contact the person and confirm that the defendant has notified the person about the risk.

13. The defendant must follow the instructions of the probation officer related to the conditions of supervision.

In addition, the defendant must comply with the following special conditions:

1. Upon release, the defendant must obtain transportation directly from the prison to his approved residence. The defendant must eliminate or minimize any stops during that transport.

2. The defendant must self-quarantine in an approved residence during the first fourteen days of his supervised release.

3. The defendant is restricted to his residence at all times during his term of special supervised release except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the officer. During this time period, the defendant will be monitored by Location Monitoring technology at the discretion of the probation officer. The defendant must follow the rules and regulations of the location monitoring program. The defendant must pay for the cost of the program to the extent he is able, as determined by the probation officer. If, after six months, defendant has not violated this condition or any other condition of his special supervised release, the court will favorably consider his request to lift this condition.

4. The defendant must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise the defendant's participation in the program (provider, location, modality, duration, intensity, etc.). The defendant must pay for the cost of treatment to the extent he is able, as determined by the probation officer.

5. The defendant must not use or possess any controlled substances without a valid prescription. If the defendant has a valid prescription, he must disclose the prescription information to the probation officer and follow the instructions on the prescription.

6. The defendant must submit to substance abuse testing to determine if he has used a prohibited substance. The defendant shall pay for the cost of testing to the extent he is able, as determined by the probation officer. The defendant must not attempt to obstruct or tamper with the testing methods.

3

7. The defendant must not use or possess alcohol.

8. The defendant must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption, except with the prior approval of the probation officer.

9. The defendant must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program (provider, location, modality, duration, intensity, etc.). The defendant must pay for the cost of treatment to the extent he is able, as determined by the probation officer.

10. The defendant must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the Financial Litigation Unit of the U.S. Attorney's Office.

11. The defendant must not incur new credit charges, or open additional lines of credit without the approval of the probation officer.

12. If the Judgment imposes a financial penalty, the defendant must pay the financial penalty in accordance with the Schedule of Payments sheet of the judgment. The defendant must also notify the court of any changes in economic circumstances that might affect the ability to pay this financial penalty.

13. The defendant must not go to, or remain at, any place where he knows controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

14. The defendant must submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. The defendant must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that the defendant has violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

4

15. The defendant must submit his computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search. The defendant must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition. A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there is a violation of a condition of supervision and that the computer or device contains evidence of this violation. Any search will be conducted at a reasonable time and in a reasonable manner.

16. The defendant must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) the defendant uses. The defendant must pay for the cost of this monitoring software to the extent he is able, as determined by the probation officer.

17. To ensure compliance with the computer monitoring condition, the defendant must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation. The defendant must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.